Good morning, may it please the Court, Robert Garcia for Mr. Vasquez, who is the appellant. The issue here is that the government failed to demonstrate that the medication they were trying to use or planned to use on Mr. Vasquez is not shown to be safe nor necessary under the SELVS and Rivera analysis. The first issue that I'd like to address is that the government is charging, is the government charging the defendant with a serious crime? Is it 1326? Well, before you get to that, I'm looking at the transcript of the March 24 hearing, and the Court starts out by saying, it is my understanding, given the hearing today, that the parties wish to proceed on a SEL determination prior to the Court ordering an evaluation for dangerousness. Why would you ever agree to that? Well, isn't SEL quite clear that that's not the orderly procedure? It goes with dangerousness, and then you would go to a SEL hearing? Well, it's the government who is moving forward on the basis of SEL. Well, that's not my question. SEL says in fairly explicit terms, I would submit, that the proper order is dangerousness for all the reasons Justice Breyer goes at great length to spell out, and then if the dangerousness issue is resolved against the government, then you go to a SEL procedure. So why would you encourage the district court to go to just the opposite? Well, based on the evidence that we had, we felt that that was the best way to proceed, but the Harper analysis, the facts that we had here, we felt that to address SELs, we'd be able to overcome any dangerousness issue. Well, that's not the way the Supreme Court asked this process to unfold, is it? Well, no. But if the court feels that a Harper analysis should be done first, then the case should be remanded for that Harper analysis. The issue of dangerousness. Well, I guess from your perspective, you're not unhappy if the government elects not to present evidence or pursue a Harper argument. You'd rather your client not be portrayed as dangerous. That's correct. That's why we – that's why I felt that going forward on the SEL issue would be better, because the standard is much higher, and I believe that the evidence that we had would demonstrate that forcibly medicating Mr. Vazquez was inappropriate, pursuant to SELs and Rivera, based on the SELs factor. And the first factor in SELs is, does the government have a substantial interest in charging – in moving for a forced medication issue, based on the offense? Now, is it serious enough to justify a forced medication order by the court? And that's the first issue. He was – he's charged with the 1326, a deported alien being found in the United States. What kind of sentence was he looking at, if convicted? Well, if convicted, the advisory guidelines were about 92 months or – to 115 months. But that's, of course – That's more than trivial. No, it's not. No, it's not. But that's – that has to do with his criminal record and not with the act itself, in the sense that – The court tells us in SELs, it's not – you don't look just at the act. You look at the individual. In this case, we've got an individual with a pretty impressive criminal record that, if convicted of this crime, would be facing some pretty serious time, suggests that the government may have a pretty serious interest in being able to proceed with the prosecution. Yes, but – yes, that's true. But the act itself of being in the United States is not serious in that it's not a crime of violence or it's not a crime of moral turpitude in the sense that Mr. Vasquez used a false passport or falsely declared himself to be a U.S. citizen or did some – some other act of moral turpitude to be found in the United States. He was just found in the United States. Well, I'm – I'm uncomfortable with the idea that courts ought to be parsing criminal statutes and deciding which crimes are serious and which crimes aren't when – when Congress has already decided there are – we're going to – and one of the ways we're going to indicate seriousness is – is to set out a sentencing range. And then the Sentencing Commission comes up with a guideline range. And it looks at the individual as well as the offense, which is something that SELs specifically directs the court to do. You know, we're – why should – why should courts decide essentially on an ad hoc basis whether – whether a crime is serious enough or not serious enough? Serious enough under the SELs analysis. Right. Given that SELs says you look at the offender as well as the offense, and given that Congress as the legislative branch is deciding this crime is serious enough that we think somebody should go to prison or could go to prison for it for 20 years in the case of the 1326 with an aggravated felony. So – so I'm having a problem understanding why this should be a judicial determination or why – I mean, it's – I guess what I'm saying is it's ultimately a judicial determination, but we have some indications from – from Congress that they consider it serious because of the sentencing – the maximum sentence and also the guideline. Why should we not give deference to that? To – to the congressional intent and the guidelines? Well, that should be taken into consideration. But – but the act itself as to what he did, he just showed up in the United States, and yes, it has serious consequences because of his criminal history. But the act itself, I don't believe – So why – why should we disregard his criminal history in deciding whether the governmental interest in this case is serious enough to require forced medication? Well, because he's not being charged. He's being – it's the charging count, I think, that's important here. It should be strongly considered, not – not just his criminal history. But I'd also like to – Yes, but I thought Judge Fogel's question is why shouldn't we look at the criminal history? Because when it comes down to the end of the process with the guidelines and the aggravated history, his sentence in this case is a combination of factors. Therefore – and – and the nature of the reasons for the enhancement are – indicate that it's a serious circumstance, which the 20-year – or – and the guideline, at least the guideline, would suggest Congress and the Sentencing Commission felt it was. Wouldn't that be part of the package? Well, it would be, but I think there's perhaps too much emphasis on that aspect of it. And – Are you just arguing that you don't think we should look just at the – just make a sort of a bright-line test that says if it's a 20-year sentence, it's automatically serious? That's correct, Your Honor. The – the overall – what he did in this particular instance, I mean, he wasn't – But that's where you're losing me, because I could see that you don't necessarily equate the length of sentence to seriousness. But on the other hand, that doesn't end the inquiry, because if the underlying nature of what he takes up there makes it a serious package, then why wouldn't that be appropriate for the government to be able to argue under a sales analysis? Well, it would be appropriate, but I just don't think that in this case it really – there's too much undue focus on his criminal record as opposed to what he did. Well, I – I – Go ahead. And – You'd like a structural rule where we ignore the specific facts and look at the offense being charged. The problem itself tells us specifically, look at the individual case. Well, Your Honor, I'd like to submit on that issue, but I'd like to – I have about 40 seconds left, and I'd like to address the remaining issues. And the major one is when the government proceeded with their doctor or their expert, he was not – he listed a lot of medications that he would like to use, but he never could tell me or never could state under oath the likely outcome of using those medications. For success on Mr. Vasquez, he could just give me a generalized – in our institution, we have a 76 percent interest or success rate. What is the degree of particularity that needs to be in a judicial order on what is essentially a medical matter? Remember, you're saying it's not – you can't just give the doctor a blank check and say, render this guy competent. You have to be more specific. How specific? Do you specify the medicines, the doses, the length of time, the method of administration? In other words, how much do you micromanage it? Well, I think, first of all, you ask yourself, did the government establish that these medications would be reasonable and have a likelihood of success, the specific drugs? If the court is comfortable with that, then the court would specify, all right, you mentioned these five drugs, so this court feels comfortable with allowing you to administer these five drugs, if you feel, and we have a follow-up hearing, which in this case we were going to have a follow-up hearing, but the court was much too broad in its order. But you would not limit the court to ordering, approving a single drug. The order could specify a number of medications, at least as they've been proved up in the hearing. That's correct, Your Honor. And then leave it to the doctor's discretion which ones to employ. At which time. At which time. Yes, Your Honor. That's correct. Are you asking, is there supposed to be some status hearing, did you say? Is that what I heard you say? Yes, the court did so respond to issue a status ruling or a status hearing. It wanted a report within, I believe, 60 days of the order, and then we were going to actually have a hearing four months post-order. The specific drugs were the ones that were listed in our briefs, the five drugs, and those drugs, at the most, were the only drugs that could possibly be, meet the sales standard. But we don't feel any of them did because there was no specificity by Dr. Wolfson, the government's doctor. Thank you. If I might. You can still question. We're giving you more time. It's important. Some of our cases are over-weighted and some are under-weighted, and there's some significant questions here. And the one thing I'd like you to speak to is a year has passed. Has anything significant happened in the year that should influence, I mean, are we talking now about hypotheticals because the world has moved on or what's going on? I think the court raised a good question there, very germane, because I did receive a call from the doctor in Springfield, Dr. Wolfson, and he told me that what's going on, your client is just sitting here and nothing's being done. I think what we need to do is perhaps to make sure we're up to date is to have an evaluation ordered by Dr. Wolfson at a minimum to talk about what the current status is of Mr. Vazquez, because even at the hearing before Judge Sobreau, Dr. Wolfson admitted he had not seen or examined Mr. Vazquez for nearly ten months. And he was concerned that perhaps some of the testimony that he gave might be dated. If we were to remand, shouldn't the district court hold a Harper hearing first? Well, I don't think at this point it would hurt. But you don't want to urge the government to argue dangerousness, do you? No, I don't. I understand your predicament. It's an academic reading of self for your purpose. I understand. My only concern about the order, I mean, I shouldn't be yelling at the government. I'm not yelling at anybody, actually. But it was ‑‑ I was struck by the saying the parties that agreed to it. Now, if the stipulation was going in, there was no dangerousness, which cells does contemplate. But then immediately dangerousness works its way into the analysis, and as a result we're left with a record that perhaps may be not as focused. I just want to ask one further clarifying question. Yes, sir. Why don't you sit down? You said there's a lack of specificity, but I'm still trying to understand. What is the specificity as to the drugs that you want? You're saying that it's okay to allow the district court to approve a range of drugs, but what is the specificity that you're looking for? Well, first there was a lack of ‑‑ Oh, wait. Maybe it's Springfield. No. Guess what. It's a lifelong. I hope he's fine. He didn't even call for it. I hope he's fine. I hope this doesn't become moot. No, Your Honor, the specificity, there's two issues on specificity. First, there was a lack of specificity by Dr. Wilson, but then the court order is so broad that it doesn't ‑‑ That's what I thought you were talking about. Well, the court order is so broad that if we lose on specificity, in other words, if this court finds, no, these drugs, the five drugs that Dr. Wilson recommended, we, the court, find that they would substantially be helpful. It would be okay, right. Then we need an order by the court outlining that those are the five drugs that they are to use and not chlorazepine. That definitely is a drug that's far too dangerous. Okay. With that, I submit. Thank you. Thanks. We'll give you a little rebuttal time. Good morning. May it please the Court. Neville Hedley for the United States. Addressing the dangerousness issue, I know that that's foremost in the court's mind. I will note that on page 24 of the supplemental excerpts to the record and page 96 of the supplemental excerpts to the record, it's very clear from Dr. Wilson's report and from his testimony that he did not believe, based on the administrative policy of FMC Springfield and the policies that they had in place, that although the defendant engaged in what I would consider and I think what Dr. Wilson would consider dangerous behavior while in custody, both in San Diego at the MCC, at the Oklahoma City Transfer Center, and some conduct that occurred while at FMC Springfield in terms of potential sexual assaults on staffers, that that conduct did not rise to the level of conduct that would, under their policies, give them the free hand to forcibly medicate Mr. Hernandez-Vasquez under a Harper analysis. Well, that may be, but the problem I'm having is that we look at the cell's opinion, which very, very methodically and carefully goes through why a Harper analysis is important as a foundation, instead of backing into the dangerousness by introducing it collaterally in the cell's hearing so that it isn't focused. Taking the Supreme Court, maybe I'm over-reading it, but I don't think so. I think Justice Breyer is contemplating that the first step is to look at dangerousness. Now, if the parties agree there's no evidence of dangerousness, I don't think cells says you have to go through a meaningless exercise. But in this, one of the first things that you wind up getting into before Judge Sabra is that, oh, yes, he's got these sexual assaults, he's got this history, so it's kind of in there, but it's not focused. It seems to me the Supreme Court is making it clear that the cells order is a rare circumstance, a rare circumstance. Therefore, let's see if there's a dangerousness component where we have already established objective factors where you can measure dangerousness. If you go to cells, now it becomes this loosey-goosey stuff we're now getting into. Is it, well, a 20-year, you know, sentence or a guideline, or, you know, now we're searching about for some kind of objective measurement. And I just think we're skipping. It looks like we're skipping a step. I would disagree with the Court that we're skipping a step. We look to the medical professionals, Dr. Wilson, the staffers at MCC who were charged with taking care of Mr. Hernandez-Vasquez. And based on their policies and based on the report and the testimony of Dr. Wilson, it's that his conduct is not such that his con – even though it was untoward conduct and perhaps dangerous conduct to that staffer, there are ways to alleviate short of forcibly medicating him, so that you don't go right to or essentially do an end run around cells, the cell opinion, and go right to Harper as kind of a pretext to forcibly medicate a defendant. Kennedy. Does that mean, therefore, that when you then, when the government is now trying in a purely competency-to-stand trial analysis that it is irrelevant, his conduct at Springfield? I don't know if it's irrelevant, but it is, and this is not something that Judge Zabraw took into account in terms of rendering his opinion and rendering the order. I think it's something that the judge needs to be made aware of. It is something that went into the analysis and the evaluation of Dr. Wilson. It's clearly something that was in the patient's mind, that Mr. Hernandez-Vasquez talked about as part of his psychosis, that he was trying to deflect and create, I guess, a straw man in his mind that somebody else was responsible for some of the sexual misbehavior that he was accountable for or that was attributable to him, and that related to part of the psychosis. So I think Dr. Wilson brought that up. The government elicited that testimony as something that was relevant for the Court to consider as part of his psychosis, part of his conduct while in custody, but Judge Zabraw specifically avoided that in rendering his position or his opinion about the four factors under cell. So it wasn't, it wasn't something that was taken into account, his post-custodial or post-custody and post-arrest conduct at the MCC. Judge Zabraw may not have, but I'm trying to understand the regime that the government is advocating here. We're not just talking about this case because whatever this case decides will basically, if we go with what you're presenting to us and the record of this case, is that it's okay. Even though there are elements of dangerous conduct lurking in the case, it's okay for the government and the defendant to stipulate that that conduct isn't part of the analysis. And I'm not sure that that's what cells allows us to do. Maybe it does, but that's what I'm concerned about. Well, Your Honor, it's something that was brought to the Court's attention. The Court also had the benefit of Dr. Wilson's report, and then after the hearing the benefit of Dr. Wilson's testimony. In both his report and his testimony, he makes it very clear, and this is kind of a paradox of the cell opinion, that you have, in conjunction with Harper, that you have a person, Mr. Hernandez-Vazquez, who, although has engaged in what might be considered dangerous conduct while in custody, that conduct doesn't rise to the level, based on the medical professionals who are evaluating and taking care of him, to allow them, based on their policies, based on how they treat these patients at their facilities, to forcibly medicate them under how they view Harper. They're aware of Harper. They're aware of cell. And that that kind of conduct can be – precautions can be taken. They can put them in lockdown states. I think we're talking about two different things, because substantively I understand what you're saying. But procedurally, what it seemed to me cell was saying is this, that forcibly medicating somebody is a major invasion of their person. And there are established exceptions to that. There are established bases for doing that, dangerous to self, dangerous to others, which are recognized in the law and have a long history. When you add to that a new reason for doing it, which is the government wants to try somebody who's psychotic or otherwise incompetent, that that's a more complicated inquiry. And it's not clean. It's not like, well, you know, this is a good reason to do it. Let's just do it. You have to go through this whole four-part analysis that cell talks about. So the court says it's better, before you do that, to make sure that you don't have one of the traditional reasons, which is dangerousness under Harper. So I think what all of us are uncomfortable with, if I'm hearing my colleagues correctly, is that somebody just made a decision, well, we're going to bypass the Harper inquiry, rather than putting it in front of the court and saying, here's what we've got. You know, maybe there's no finding of dangerousness that can be made, but that evidence needs to be put on so the court can evaluate it and then get to the cell inquiry, rather than just bypassing it entirely and pretending that it didn't exist. That's my view, and I think there's a similar discomfort from all of us. Well, Your Honor, I understand the Court's concern, and I don't think that that's what happened. The evidence and the testimony of Mr. Hernandez-Vezquez's dangerous conduct while in custody was brought to the Court's attention. Dr. Wilson was aware of it. He confronted Mr. Hernandez-Vezquez during his evaluation about it. But clearly, I think, from the government's perspective — Where did that go to? Pardon me? What was the fact that his conduct, his arguably dangerous conduct, what was it relevant to? Well, one, to inform the Court, because there is — For what purpose? Well, because there is a potential Harper analysis. But, Your Honor — That's the problem. It's either a Harper analysis or you're trying to use it to show seriousness of the offense or something to meet the cell standard. That's what is confusing. You say it's in the courtroom. That's fine. It's in the courtroom. But what do we do with it? Well, Your Honor — What's it relevant to? What it's relevant to is that, one, it informs the Court that there perhaps might be — and go with the Harper analysis. Let me just say why I am concerned. This is forcibly medicating the defendant. We do not want district judges under Sells, as I understand it, or under Harper, to get a lesser threshold to impose a Sells kind of forced medication by putting in and slipping in a little bit of dangerousness evidence where they would not have been, it would never pass the Harper test. But you sort of prejudice the Court toward allowing a Sells forced medication where there's this dangerousness aspect floating around and it hasn't been focused so that the procedural safeguards that are there and the legal safeguards that are there for the defendant before he's forcibly medicated get focused on. And what I'm uncomfortable about the government's position is it seems to say it's okay, we can skip Harper, and we'll get — if there's any sort of dangerousness stuff, the judge will have it in front of him or her. What's the structure? Well, Your Honor, the structure, I think it goes back to the procedural analysis that I put in or the procedural posture that I put the issue in front of the Court. First of all, we were seeking a Sells forced medication. That was what was recommended by the medical professionals at Springfield. In the alternative, we were also seeking that if the Court didn't believe that forcibly medicating him under a Sells analysis to restore him to competency to bring him to trial, we also were requesting that the Court at least consider a different type of dangerousness evaluation, 4246, to see if he should be committed to the custody of the Attorney General based on a dangerousness evaluation under 4246. So that is another reason why his dangerous conduct was at least brought before the Court, because at the Court, if Judge Sobral had decided, you know what, I don't think the government has met its burden, I don't believe the four factors of Sells have been met. But I'm going to now turn my attention, instead of doing this in a stilted, you know, rigid approach, let's move on now to 4246. Let's move on to 4246 and see if we'll just, I will order him to be sent back to Springfield under 4246 to have him evaluated by the medical professionals there again for a dangerousness evaluation under 4246 for commitment. Court, the government at that point is conceding that he's not going to be restored to competency with respect to any type of forcible medication, and he's going to dismiss the charges. But perhaps we believe that he might be a danger to society, a danger to himself, and might be somebody who needs to be civilly committed under 4246. So that's another reason why his dangerous conduct, while in custody, needs to be brought before the Court, in a sense because the government brought this up to the Court's attention to consider all the factors, factors to restore him to competency under Sell, and if that was not appropriate, if the Court did not agree with the government's position, then it would move towards a 4246 commitment. Isn't there some logic, though, apart from the fact that the Supreme Court said you should almost never bypass the Harper inquiry? I mean, it said that explicitly. But isn't there a logic to it, that if you're talking about the balance of the defendant's civil rights and the government's interests, that you start with the traditional one, the person is dangerous to others. That's deeply embedded in the law. Nobody's really going to argue with that. And you have that analysis, and then if that doesn't work, you know, then you go to your But there's a logic to proceeding in that order that wasn't present in this record. It all got conflated. Well, Your Honor, I disagree with that characterization that it got conflated. I think what would happen was the Harper inquiry, although not specifically articulated, the medical professionals, Dr. Wolfson in particular, made it very clear that he didn't think Harper was appropriate, that there was no reason to forcibly medicate him under Harper based on his conduct in custody, that there were ways to address that conduct, keeping him in lockdown, keeping him away from female medical professionals, things like that, that was not going to, under FMC policy, were not going to rise to the level, under the way they've interpreted Harper, forcibly medicate him. You've said that, and I think we've got your point. I think it's also important to move on to the specificity issues of the substance of the order. Yes, Your Honor. With respect to the specificity, I think the Mr. Garcia's reliance upon Rivera-Guerrero is misplaced in that although Rivera-Guerrero talks about let's go through with specificity the types of drugs, that's exactly what Judge Subraw did here. But that's not what his order says. I mean, his order says the method of treatment and type of medication to be used shall be at the discretion of the treating medical professionals within Bureau of Prisons. I mean, I read that, and it seems to me after having had this hearing where specific drugs are discussed, and I understand that the prescription shouldn't be written by the judge, but they had a discussion about specific drugs, and Sells talks about making a finding that is medically appropriate, and then it looks like there's carte blanche, that the medical professionals can do whatever they want under the terms of this order. That's not – I believe that's incorrect, Your Honor, in that with all due respect, Judge Subraw had the benefit of not only reviewing Dr. Wilson's report, and he – That's right from the order. Does the order say this or not? The – The method of treatment shall be at the discretion of the treating medical professionals. Is there any limitation there? In terms of – he turns it over to the discretion of Dr. Wilson after hearing Dr. Wilson's – In what, counsel? To use the second generation of drugs that were discussed at the hearing. It doesn't say that in the order. I don't necessarily believe it says it in the order. It says it in his – You would never get an injunction enforceable by criminal contempt if it were as general in this and just told somebody, don't engage in bad behavior. What you've done is on the flip side are arguing to us that we should say it's okay for a district court to hear detailed evidence on dosages, risks, and likelihood of success, and then say at the end of the process, do whatever you may at your discretion administer drugs. There's no limitation. Well, you're – Why are you defending that? Why don't you want the doctor to have some guidance, some resolution from the judge? How does the doctor know which of the drugs is okay? Or is the judge basically saying, I've heard evidence on five drugs, and because there's no limitation, just use any of the five drugs, or maybe a sixth drug, or what? Well, in – in – in fashioning his order at the end of the hearing, he said that judge – or Dr. Wilson's approach to medicating Mr. Hernandez-Vazquez was eminently reasonable, and that he would attempt to use – Dr. Wilson laid out what his – what his prescribed course of treatment would be. Where's the – where does that say that in the order? Your Honor, it – the order is not – I guess the order is not – What if you – what if you leave the U.S. Attorney's Office? You're not there. And Mr. Garcia gives up practice and retires. So the only people now who are around to enforce the defendant's rights are people who don't have the experience of having been in front of Judge Sabra. How does the defense counsel know what the limitations are on the doctor? Your Honor, what if something happens to the doctor? We're getting into a very dangerous – where judges then are then making medical determinations. What? What's the medical determination? You're saying implicit in the order is the very thing that isn't there. First use this medication if that doesn't work. No. That's not what counsel's arguing for. He's saying what he – as I understand it, he said, these are the drugs that were presented. These are the drugs that have – I have been persuaded that are legitimate and have met the sales standards. Therefore, the doctor may proceed to use at the doctor's discretion and in the order and sequence that the doctor may determine. But there are limitations on what the doctor can do. Well, I think that's why there was a status conference set up within 60 days – a report and then a status four months afterwards. So a report to be issued within 60 days and a status four months afterwards to check on the prognosis or the progress of the treatment of Mr. Hernandez-Vasquez. I think you – I don't want this disagreement to seem bigger than it is because I understand your position. You're not arguing that the doctor can do any darn thing he wants to. You're arguing that the order should be understood in the context of the presentation with the understanding there's going to be a status hearing. And the concern I think we're trying to raise is that, well, it may be that everybody within the circle of this proceeding understands that's how it's supposed to be, but the order itself neglects to say that. And that's the kind of thing that probably should be put into a written order someplace, isn't it? Well, Your Honor, I would be uncomfortable drafting an order for a judge about how to treat somebody who's got a broken psyche. But let me start with the first question. Do you think that the doctor has a blank slate? No, I do not, Your Honor. So you think there are limitations. Where do the limitations come from and where are they expressed? I think the limitations come from what happens in the report that's issued to the judge 60 days afterwards and a status hearing four months afterwards. What can they do during those 60 days? Pardon me? What can they do during the 60 days? Treat Mr. Hernandez-Vasquez in the manner that was laid out before Judge Subraw that he found eminently reasonable. So why shouldn't the order specify these are the drugs that can be used? Because as it stands now, you look at the order, there's nothing that suggests the doctor can't, I think, turn into Dr. Frankenstein or wire him up somehow. I think, one, that doesn't give enough credence or credibility to medical professionals. Secondly, I think it becomes dangerously close to judges. Counsel, let me tell you a little experience that at least two judges on this panel had. And that was the lethal injection protocol of Mr. Morales. And when Judge Fogle's order was actually read to the anesthesiologist and they found out what they were actually authorized to do, they backed out of the execution because they had not been told that or understood that from the counsel and the people who were advising them on behalf of the state of California. So the doctors needed specificity. They weren't told exactly what to do, but they were told what their duties were and what their limitations were. So it does make a difference, and it does seem to me that I really have a lot of trouble why the government is so resistant to including some degree of guidance to the doctors, some limitations, and you're arguing so vigorously when you are arguing that all of these restrictions are there implicit in the order. What is wrong with making them explicit? But I'm not sure that the – I think that goes down a very slippery slope to tying the hands of a medical profession treating someone with a broken slight hand. But that's – Justice Breyer talks about that. He said that's one of the reasons that you try to do a Harper hearing, because when you get into the SELL hearing, you necessarily have the judiciary intruding into medicine. I mean, that's contemplated in SELL. I mean, the way that this order reads right now, you could give Mr. Hernandez-Vazquez an electroshock, and it wouldn't violate the order. I believe that would, Your Honor. No, it doesn't. It just says they can use any – they can – whatever medical treatment they think in their discretion is appropriate to restore him to competency. It doesn't say you – you know, what's wrong with saying you can use five drugs, and you can use them in your discretion in the dosages and the methods of administration that are medically appropriate? How is that going down a slippery slope? And it seems to me that's explicitly what's required in United States v. SELL. I don't – Your Honor, I'll concede that point. I don't think there's anything wrong with that. But I think that – that in terms of laying out specific drugs, then you get closer to specific dosages, and moving from 30 days on this type of treatment, 30 days – if that doesn't work, you're allowed to move to this. You're allowed to inject. I actually agree with you about this, that you could get too specific. That's why I asked Mr. Garcia the question. You could – you could micromanage it and say, you know, you should use a 50 cc syringe and you should only do it three times a day and so on and so forth. I mean, that's – I don't think that's what we're talking about. This – this order doesn't have any specificity in it at all. I think we have your position. That's something we're going to have to resolve. Thank you, Your Honor. I'll try to use less than a minute, Your Honor. The – as far as the specific drugs, we are not conceding that they would substantially likely render Mr. Vasquez competent to stand trial because there was no evidence. Okay. Understanding that you're not conceding that, if the judge rules against you on that and says, I have been persuaded under the sales analysis that these drugs are appropriate, that there is proper balance between the risk of harms and side effects and probability of success, what are you looking for in the order that would cabin the doctor's discretion that isn't there now? Yes. Thank you. That the court would permit the institution to use five antipsychotic drugs. And I have the names here listed. Well, whatever they are, the ones that were presented during the hearing. Right. The five. Definitely not Clozapine because it has a risk of heart attack. So you're arguing of the five, one of them. Of the six. Of the six, one of them you would argue hasn't met the standard. That's correct. Definitely against, Your Honor. But the remaining five, that the institution could use those in a dosage that they feel is medically appropriate and that we have a status hearing. Which apparently the judge did order. Already did that. Okay. Thank you. Thank you very much. Appreciate counsel's argument. It's a very important and challenging case. Case argued as submitted. All right. The next case on calendar is United States v. Taruta. May it please the court, Robert Garcia for subpoena Taruta. My co-counsel, Mr. Vincent Bronco will be presenting the argument. All right. Fine. Good morning, Your Honor. This is Vincent Bronco.
judges: Fisher, Clifton, Fogel